(1C0 App. Div. 758)

### YOUNGMAN v. NORTH ELECTRIC CO.

(Supreme Court, Appellate Division, First Department.   February 20, 1914.)

1. BROKERS (§ 52*)—PERFORMANCE OF CONTRACT.

   Under a contract by which plaintiff's assignor agreed to bring defendant and another together so that they could negotiate for the sale and purchase of patent rights owned by defendant, which provided that assignor should be paid a special commission "if a sale is made," assignor was entitled to a commission if a sale was actually made after he brought the parties together.

   [Ed. Note.—For other cases, see Brokers, Cent. Dig. § 73; Dec. Dig. § 52.*]

2. BROKERS (§ 57*)—PERFORMANCE OF CONTRACT.

   Where plaintiff was entitled to a commission under a contract with defendant, "if a sale was made" of patent rights after plaintiff had brought defendant and another together for negotiations, that the sale made was in the form of a license, which, however, was practically a sale, would not prevent plaintiff from recovering commissions.

   [Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 66, 67, 72; Dec. Dig. § 57.*]

   Ingraham, P. J., and Hotchkiss, J., dissenting.

Appeal from Trial Term, New York County.

Action by Walter L. Youngman against the North Electric Company.   From a judgment for defendant and an order denying a motion for new trial, plaintiff appeals.   Reversed, and judgment directed for plaintiff.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and HOTCHKISS, JJ.

Howard Taylor, of New York City, for appellant.
Merton E. Lewis, of Rochester, for respondent.

SCOTT, J. In my opinion the case was tried and submitted to the jury upon an entirely erroneous theory. That theory is illustrated by the following sentence from the charge of the court:

"This is what we ordinarily call a brokerage case—a case in which a broker sues for a commission. The law is that a broker is entitled to a commission for a transaction, provided the transaction be procured, as we call it, or concluded, as it may be, through his effort and during the time of his employment. That practically covers the real issue that you will have to determine. Was this transaction concluded through the efforts of Mr. Dukelow, and was it concluded during the time of his employment?"

[1] As I read the evidence, this is in no wise an ordinary brokerage contract, because, while it is conceded that Mr. Dukelow was employed by defendant to render certain services, he was not employed, nor was he ever authorized to negotiate a sale. His authority and duty was apparently limited to negotiating between the parties and bringing them into a position where they could negotiate between themselves. Defendant owned patent rights for a device believed to be useful in telephony. A very obviously desirable, but apparently a very indifferent, customer was the American Telephone & Telegraph Company. The defendant's officers naturally desired to be brought into touch with that company, and plaintiff's assignor, owing to his personal relations with the vice president of the American Company, appeared able to bring the parties within negotiating distance of each other. This he did, and it was after he had done this that the contract was made to pay him a commission. That contract is evidenced by a letter which is not disputed. By it plaintiff's assignor was to be paid a special commission "if a sale is made," not if he affected a sale, because he was never put by defendant in a position to negotiate a sale—that matter was reserved by defendant's officers for their own management. Dukelow had then done all that he had apparently been employed to do—certainly all that he was asked or authorized to do. He had brought the parties together, and paved the way for the sale that was afterwards made. From that point there remained only to agree upon terms and price, and this the defendant kept in its own hands. Dukelow undoubtedly took the chance that no sale would be made. If it had not been, he would have been entitled to no commission. It was made, however, the condition of his contract was fulfilled, and he became entitled, by the very terms of the contract to his agreed commission.

[2] That the sale in the end took the form of a license, which one of defendant's officers testified was "practically a sale" does not, as I think, affect plaintiff's right to recover.

In my opinion the plaintiff's motion for the direction of a verdict should have been granted. The judgment and order appealed from

should be reversed, and judgment directed in favor of the plaintiff, with costs in this court and in the court below.

LAUGHLIN and CLARKE, JJ., concur.

HOTCHKISS, J. (dissenting). Briefly, the facts are as follows: Defendant was the owner of patents for an automanual apparatus, an electrical device. It had a factory at Ashtabula, Ohio, and its patents and other assets seem to have been for some time in the market for sale to any one who might buy. In 1908 one Dukelow, plaintiff's assignor, took up the matter of a sale of certain property or rights of the company to the American Telephone & Telegraph Company, with whose executive officers Dukelow was in touch. On December 27, 1909, Dukelow first met North, president of the defendant company, and then seems to have agreed with North on the terms of his employment, which North was to report to his directors, expressing, however, his own satisfaction therewith. Dukelow continued, both by correspondence and personally, in communication with defendant concerning the details of a sale. He also seems to have continued conferences and negotiations with Vail, president of the American Telephone & Telegraph Company, looking to the same end. Some time in February, 1910, Dukelow had a conference with the directors or executive committee of defendant, when the terms of plaintiff's employment were agreed on, and he was asked to put his understanding of them in writing, in pursuance of which, on March 14, 1910, Dukelow wrote defendant as follows, this being the contract relied on:

"Boston, Mass., March 14, 1910.

"Mr. Charles North, President North Electric Co., Cleveland, Ohio—Dear Sir: Complying with the request of the directors of your company that I should send you a letter confirming my agreement with your company regarding negotiations which I have been and am now having with officials of the American Telephone & Telegraph Company regarding the sale of the automanual apparatus, patents or other assets or stock of your company, I beg to state that my agreement is that if a sale is made to the American Telephone & Telegraph Company or to any of their associated companies or to parties in the interest of the American Telephone & Telegraph Company of automanual apparatus, patents, assets or stock of your company, I am to receive from your company, if the sale is made on the basis of $1,000,000 a commission of 10%. Should the sale be made for a less amount than $1,000,000, my commission is to be 7½%. Should a sale be made at a price exceeding $1,000,000, I am to receive from your company a commission of 10% up to $1,000,000 and 15% on the amount in excess of $1,000,000.

"Yours very truly, Charles T. Dukelow."

It is conceded that no sale of anything was at any time actually consummated by Dukelow, although he claims that for some time after the date of this letter, he kept Vail within the sphere of his influence. There was evidence tending to show that on April 15, 1910, North, defendant's president, told Dukelow that negotiations with the American Telephone & Telegraph Company were off, and that negotiations with other parties were pending and would no longer be held in abeyance awaiting a sale to that company. This is denied by Dukelow, and there is documentary evidence strongly corroborating him.

But the question is not of present importance. Thereafter North took up negotiations with one Stevens, as the result of which, it seems, that Stevens organized a concern known as the Telephone Improvement Company, which purchased substantially all of the capital stock of the defendant company, and thereby acquired control of defendant, its assets, patents, etc. In 1911 Stevens employed one Johnson to open negotiations with the Western Electric Company, and in January, 1912, an agreement was effected between that company and the Telephone Improvement Company, by which they exchanged licenses to use certain of each other's patents, and the Western Company paid to this defendant $375,000 in cash. This transaction took place about one year and nine months after the date of plaintiff's contract, and many months after plaintiff's negotiations, conferences, or other attempts to forward a sale had ceased. The Western Company is concededly a subsidiary of the American Telephone & Telegraph Company.

The court left to the jury the following questions: (1) Was Dukelow the procuring cause of the sale? (2) Did the contract embrace and authorize plaintiff to sell what was sold? (3) Was the sale concluded during the term of his employment, or had his service been ended by discharge or abandonment? There was a general verdict in defendant's favor.

I think the appeal must fail. Whether the sale of the license was within the subjects covered by Dukelow's authority to sell was determined against him by the jury; therefore the only grounds on which the judgment can be disturbed are that, as matter of law, the sale of a license was within the purview of Dukelow's contract, and also, without regard for the fact whether or no he was the procuring cause, he was entitled to his commission in the event any sale was at any time effected to a subsidiary of the American Telephone & Telegraph Company. If either of these questions is determined against him, the appellant cannot succeed. As to the first: The subjects of sale described in the contract were "apparatus, patents or other assets or stock of your company." A license is not included within any of the above subjects, unless it be "assets." While the right of a patentee to issue licenses may be in a certain sense an asset, it is certainly not necessarily, as matter of law, within the meaning of the phrase "or other assets" as used in this contract, the language of which would seem to contemplate a sale of all the company's property rather than a part. By the words, "apparatus, patents or other assets," the company's physical property is described, but to cover the contingency that the sale might take the form of a transfer of the indicia of ownership rather than the physical properties, the phrase "or stock" was added. But for other reasons I think the contract cannot be said to unequivocally embrace a license. The word "patents," being the greater and comprehending the less, would by inference seem to exclude the latter. Such a construction is most reasonable. The holder of a patent which is for sale may, for many reasons, prefer not to sell licenses for its use. If he sells his patent, all responsibility for subsequent infringements falls upon the pur-

chaser, who must bear the expense of sustaining his rights; whereas one who licenses another to use must protect his licenses from infringements, and also defend his invention if its legality is assailed. To put it another way: If after the owner of a patent had employed an agent to sell the patent, the owner himself should negotiate a license for a limited use of the patent by one with whom the broker had been negotiating for a sale of the patent, would the owner, as matter of law, be liable for brokerage on the proceeds of the license? To my mind the question answers itself. As to the second question: Had appellant at the trial taken the position that the contract was vague and its true meaning was only to be ascertained by the aid of the circumstances attending it, the verdict for the respondent could not be questioned. But he did not do this. At the trial, as on this appeal, he contended that the contract needed no aid from extrinsic evidence, and yet the major part of his argument is an appeal to this evidence. As I have hereinbefore said, the sole question is: Was Dukelow as matter of law entitled to commissions in any event? The contract does not say so. The contract says, "if a sale is made." The natural interpretation of these words, at least in the absence of any expression to the contrary, I think, would be to read them in the light of the law bearing upon the relations between broker and principal; under such circumstances and in this situation, the necessity for the broker to be the procuring cause is undoubted. That appellant had no control over the price, and that his customer was limited to the American Telephone & Telegraph Company as well as the numerous other facts given in evidence, and from which appellant ingeniously argues that the contract carried an obligation to pay whenever and however a sale was made to this customer, at best are but circumstances, and their weight was for the jury, in interpreting the intent of the parties.

Briefly, the contract does not contain words of such impelling import as to permit us to construe it as an obligation binding defendant to pay in any event.

The judgment and order should be affirmed, with costs.

INGRAHAM, P. J., concurs.